## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| MICHAELA BORJA, on behalf of herself and all others similarly situated, | Case No. 25-cv-359 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. |  |
| WESTCONSIN CREDIT UNION | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Michaela Borja ("Plaintiff"), individually and on behalf of the class of persons preliminarily defined below (the "Class"), makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge:

### NATURE OF THE ACTION

1.      Plaintiff brings this lawsuit against Defendant on behalf of herself and all others similarly situated on the basis that Defendant WESTconsin Credit Union has violated the Electronic Fund Transfer Act, 15 U.S.C. § 1693, *et seq.* ("EFTA"), and Regulation E thereto, 12 C.F.R. § 1005.1, *et seq.* ("Regulation E"), and Defendant has economically harmed Plaintiff and its other customers through the use of deceptive, unclear, and ambiguous language which fails to notify its customers of Defendant's true overdraft fee practices and accordingly fails to provide customers like Plaintiff and the putative class with the ability to plan their finances effectively to avoid these onerous fees.

2.      Regulation E requires that, before a financial institution may charge overdraft fees ("OD Fees") on one-time debit card and ATM transactions, it must obtain the consumer's

affirmative consent to participate in the overdraft service. In order to do so, financial institutions must provide customers with a complete, clear, and easily understandable disclosure document that accurately describes its overdraft services (the opt-in disclosure agreement). The opt-in disclosure document must be substantially similar to Regulation E Model Form A-9 and presented to customers as a stand-alone document not intertwined with other disclosures. The financial institution must then obtain the customer's verifiable agreement to opt-in to the financial institution's overdraft program, regardless of the method of opt-in (i.e., in person at a branch, online, or by phone), only after which may it begin assessing overdraft fees on one-time debit card or ATM transactions.

3.     Defendant provides its accountholders with an Overdraft Opt-In disclosure agreement ("Opt-In Form"), attached hereto as **Exhibit A**.

4.     Defendant's Opt-In Form fails to provide a clear and unambiguous description of both the how and when its accountholders can expect to be assessed overdraft fees in clear violation of the requirements of the EFTA and Regulation E.

5.     Defendant's Opt-In Form also improperly relies on language included in separate contract documents to provide a description of Defendant's OD Fee practices that accountholders were asked to opt in to. As such, Defendant failed to present its opt-in disclosure agreement in a manner that is "segregated from all other information," as Regulation E requires. 12 C.F.R. § 1005.17(b)(1)(i), cmt 17(b)-6.

6.     Because Regulation E prohibits financial institutions from charging any overdraft fees on one-time debit card and ATM transactions without first obtaining affirmative consent based on a proper and accurate disclosure of its overdraft practices as presented in a stand-alone disclosure agreement, Defendant's assessment of overdraft fees on one-time debit card and ATM transactions against consumers has been and continues to be illegal.

## PARTIES

7.      Plaintiff is a citizen of Wisconsin and resident of Eau Claire, Wisconsin, in this District. Plaintiff has maintained a checking account with Defendant at all times material hereto.

8.      Defendant is a citizen of Wisconsin and maintains its principal place of business in this District in Menomonie, Wisconsin. Defendant is a credit union with more than $2 billion in assets, that maintains fifteen locations throughout Wisconsin and Minnesota. Defendant is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the Class, in this District.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction under 28 U.S.C. § 1331 because this case involves a federal question as Plaintiff alleges violations of the Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq.*, and Regulation E, 12 C.F.R. § 1005 *et seq.*

10.      This Court has personal jurisdiction over the Defendant because it resides in, regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and/or services provided to persons in this District.

11.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District—where Defendant maintains its headquarters.

## BACKGROUND AND FACTUAL ALLEGATIONS

I.      **DEFENDANT VIOLATES THE EFTA AND REGULATION E.**

A.  **Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees**

12.      The EFTA, 15 USC 1693 *et seq.*, is intended to protect individual consumers engaging in electronic fund transfers ("EFTs"). EFT services include transfers through automated

teller machines ("ATMs"), point-of-sale terminals, automated clearinghouse systems, telephone bill-payment plans in which periodic or recurring transfers are contemplated, and remote banking programs. Prior to December 2011, the Federal Reserve Board was responsible for implementing the EFTA.

13.     The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not decide on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar transactions into overdraft, banks could collect large fees on low dollar transactions that were almost always quickly repaid. It was a low risk, high reward for the financial institutions while customers suffered the costly effects.

14.     And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker.

15.     The Federal Reserve also noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

16.     Recognizing that banks and credit unions had strong incentives to adopt these punitive overdraft programs, in 2009, the Federal Reserve Board amended Regulation E to require

financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders before the institution could assess OD Fees on ATM and non-recurring "point of sale" debit card transactions. Specifically, Regulation E requires financial institutions to provide consumers with accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only after a consumer opts-in is the financial institution allowed to assess overdraft fees on these transactions. If a consumer chooses not to opt-in to the financial institution's overdraft service for one-time debit card and ATM transactions, then the financial institution is prohibited from assessing an overdraft fee in connection with any such transaction, regardless of whether payment of the transaction would create an overdraft.

17. Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of money for a small period of time, then charge a large fee that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest, all with almost no risk as only a very small percentage of the overdraft customers failed to repay the overdraft. Moreover, prior to Regulation E, consumers were often automatically enrolled in these punitive overdraft programs.

18. In July 2011, rulemaking authority under EFTA generally transferred from the Federal Reserve Board to the Consumer Financial Protection Bureau ("CFPB") pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act. The CFPB restated Regulation E at 12 CFR Part 1005 in December 2011.

19.     Like the Federal Reserve, the CFPB recognized that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The CFPB estimated that the banking industry had collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."

**B. Regulation E's Opt-in Requirement**

20.     In response to these issues, the Federal Reserve and CFPB promulgated and restated Regulation E, which requires financial institutions like Defendant to obtain informed consent, by way of a written document that, segregated from all other information, fully and accurately describes the financial institution's overdraft services in an easily understandable way. If an accountholder does not opt-in to the financial institution's overdraft program, the financial institution must either cover the overdraft without charging a fee or simply decline payment of the transaction at the point of sale. In either scenario, the institution may not charge a fee against the accountholder's account because the accountholder has not consented to participate in the overdraft program.

21.     Regulation E also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document "segregated from" other forms, disclosures, or contracts provided by the financial institution. The notice must also accurately disclose to the account holder the institution's overdraft charge policies. The accountholder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 205.4(a)(1).

22.     The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure.

23.     Financial institutions are not permitted to circumvent Regulation E's disclosure requirements by reference to reliance on other account agreements, disclosures, or marketing materials. Rather, Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies that is "segregated from" the other lengthy and convoluted documents that collectively set the terms of members' accounts. 12 C.F.R. § 1005.17(b)(1)(i).

24.     Regulation E provides a private cause of action for a financial institution's failure to abide by its disclosure requirements. Plaintiff thus seeks restitution of improperly charged OD Fees in violation of Regulation E.

25.     Moreover, because Regulation E's requirements are incorporated into the EFTA by way of Section 905(a), 15 U.S.C. § 1693c(a), any violation of Regulation E also violates the EFTA, which is privately enforceable under Section 916, 15 U.S.C. § 1693m.

**C.  Overdraft Calculations**

26.     Financial institutions' fee maximization schemes went beyond these exorbitant penalty fees for the institutions' small advance of funds to cover low-dollar overdrafts. Financial institutions also began manipulating the process as to how they would consider a transaction to be an overdraft to further increase their fee revenue. Specifically, financial institutions charged OD Fees not only when the institution actually advanced money, but also when the customer had sufficient funds in their account and so the financial institutions paid the purported "overdraft"

transactions with the customers' own money. That is, financial institutions like Defendant unilaterally decided the account was overdrawn not based on an actual lack of funds in the account, but solely based on a calculation of the account balance that excludes money placed on hold for various reasons, including holds that exceed the amount of the customer's pending transactions.

27.     Most banks and credit unions calculate two account balances. First, the "actual balance" reflects the actual amount of money in the customer's account at any particular time. This calculation does not account for holds on pending deposits or funds that have been earmarked for pending transactions. In contrast, the "available balance" represents the actual account balance minus amounts the financial institution has held from pending deposits and/or pending transactions that have not yet posted (and potentially never will post) to the account.

28.     While financial institutions use either the actual balance *or* the available balance to decide whether a transaction overdraws the account, per Regulation E, the terms of the overdraft program must be clearly and accurately disclosed in the opt-in form. Thus, when banks and credit unions use the "available balance" to determine whether a transaction is considered an overdraft, that balance calculation method must be disclosed ***and explained*** in the opt-in disclosure.

29.     Indeed, the difference between the actual balance and the available balance when determining overdrafts is material to both the financial institution and its customers. Because the account's available balance is nearly always lower than the account's actual balance, financial institutions that determine overdrafts based on the available balance instead of actual balance significantly increase the number of transactions that are deemed "overdrafts" and therefore the number of OD Fees they assess.

30.     Moreover, because financial institutions like Defendant include the account's actual balance but not the available balance on the customer's period monthly statements, customers are often unable to understand why they incur OD Fees when Defendant's own account

statements show that their accounts always contained sufficient funds to cover their transactions and so no overdraft occurred.

31.    In fact, in one study, researchers noted that consumers most often discover that OD Fees were levied against their accounts when they receive and review their monthly account statements. *See Overdraft America: Confusion and Concerns about Bank Practices*, PEW TRUSTS 7 (May 2012), https://tinyurl.com/3b4jh5n9.

32.    Studies have further confirmed that "[o]ne of the most salient themes within [consumer] complaints is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: how OD Fees Harm Consumers and Discourage Responsible Bank Products*, CNTR. FOR RESPONSIBLE LENDING 8 (May 2016), https://bit.ly/3v7SvL1.

33.    For instance, the Federal Deposit Insurance Corporation ("FDIC") stated in 2019:

> The FDIC identified issues regarding certain overdraft programs that used an available balance method to determine when overdraft fees could be assessed. Specifically, FDIC examiners observed potentially unfair or deceptive practices when institutions using an available balance method assessed more overdraft fees than were appropriate based on the consumer's actual spending or when institutions did not adequately describe how the available balance method works in connection with overdrafts.

*Consumer Compliance Supervisory Highlights*, FED. DEPOSIT INS. CORP. 2 (June 2019), https://bit.ly/3t2ybsY. The FDIC recommended that financial institutions mitigate this risk by, *inter alia*, "[p]roviding clear and conspicuous disclosures related to the possible imposition of an overdraft fee in connection with use of the available balance method so that consumers can understand the circumstances under which overdraft fees will be assessed and make informed decisions to avoid the assessment of such fees." *Id*. at 3.

34.     The CFPB also criticized this practice, explaining:

> Examiners observed that in some instances, transactions that would not have resulted in an overdraft (or an overdraft fee) under a ledger-balance method did result in an overdraft (and an overdraft fee) under an available-balance method. At one or more financial institutions, examiners noted that these changes to the balance calculation method used were not disclosed at all, or were not sufficiently disclosed, resulting in customers being misled as to the circumstances under which overdraft fees would be assessed. ***Because these misleading practices could be material to a reasonable consumer's decision making and actions, they were found to be deceptive***.

*Supervisory Highlights*, Cons. Fin. Prot. Bureau 8 (Winter 2015), https://bit.ly/3jVNHY2 (emphasis added).

35.     Put simply, under Regulation E, a financial institution may decide which balance it prefers to use when assessing OD Fees on one-time debit card and ATM transactions; however, Regulation E is also very clear that the financial institution must disclose this practice accurately, clearly, and in a way that is easily understood.

36.     Because the Regulation E opt-in disclosure must include this information in a standalone document that is "segregated from" other disclosures and agreements, the use of available balance must be stated in the opt-in disclosure agreement to conform to Regulation E and permit the assessment of OD Fees on one-time debit card and ATM transactions.

37.     Either inaccurately or failing to describe the use of available balance as part of its overdraft practice violates the plain language of Regulation E and the EFTA.

38.     Indeed, the CFPB and other regulators repeatedly have stated that it is unfair and deceptive to assess overdraft fees on transactions that did not overdraw the actual balance of the account.

**D.  Defendant's Processing of Debit Card Transactions**

39.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically

or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

40.    At this step, if the transaction is approved, Defendant immediately reduces the available balance in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

41.    Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account in a step called "settlement."

42.    Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

43.    Because the account's available balance was reduced to reflect the transaction at authorization, there is no change—no impact whatsoever—to the available balance in an account when the transfer occurs at settlement.

44.    By contrast, the account's actual balance is unaffected by the authorization of debit card transactions and is not reduced to reflect the transaction until the transaction settles.

45.    Multiple days may pass between the authorization and settlement of a debit card transaction.

46.     Accordingly, it is crucial that financial institutions inform their consumers whether overdrafts will be determined at the time the consumer makes (and Defendant authorizes) the transaction or at the time Defendant settles the transactions, which can occur days later.

47.     Put simply, under Regulation E, a financial institution may decide whether it prefers to determine overdrafts at authorization or settlement; however, the financial institution must disclose that information accurately, clearly, and in a way that is easily understood.

48.     Because the Regulation E opt-in disclosure must include this information in a standalone document that is "segregated from" other disclosures and agreements, the opt-in disclosure agreement must inform consumers when Defendant will determine overdrafts (at authorization or settlement) to conform to Regulation E and permit the assessment of OD Fees on one-time debit card and ATM transactions.

49.     Either inaccurately or failing to describe the time an overdraft occurs as part of Defendant's overdraft practice violates the plain language of Regulation E and the EFTA.

50.     Indeed, the CFPB and other federal regulators have found that it is "unfair," "abusive," and "deceptive" to assess overdraft fees on debit card transactions that did not overdraw the account at authorization, particularly where the consumer did not unambiguously agree to the practice.

51.     For example, the CFPB ordered Regions Bank to pay $141 million to reimburse consumers for overdraft fees on debit card transactions authorized on sufficient funds, noting such fees result from "counter-intuitive, complex processes" and finding them to be "unfair" and "abusive" in violation of federal law. Consent Order, *In the Matter of: Regions Bank*, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

52.     In October 2022, the CFPB again declared that the assessment of overdraft fees on debit card transactions authorized on sufficient funds may constitute an "unfair act or practice"

because consumers cannot reasonably avoid these "unanticipated" OD Fees. *See Circular 2022-06, Unanticipated Overdraft Fee Practices*, Cons. Fin. Protection Bureau (Oct. 26, 2022), https://bit.ly/3VJm3uB.

53.    In December 2022, the CFPB ordered Wells Fargo Bank, N.A. to refund $205 million in such "Authorized-Positive Overdraft Fees" and again declared such practice to be "unfair, deceptive, or abusive" in violation of federal law. Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, No. 2022-CFPB-0011 ¶¶ 47, 60 (Dec. 20, 2022) (Dkt. 1), https://bit.ly/3ZdnwMM. The CFPB reasoned that "[c]onsumers may be taken by surprise when they incur Authorized-Positive Overdraft Fees because they believed that if they had enough money to cover the relevant transaction when it was authorized they would not incur an Overdraft fee. These Authorized-Positive Overdraft Fees were not reasonable avoidable because they were contrary to consumers' reasonable expectations." *Id.* at ¶ 44.

54.    And in its Winter 2023 Supervisory Highlights, the CFPB again stated this practice is "unfair," as "[c]onsumers could not reasonably avoid the substantial injury, irrespective of account-opening disclosures." *Supervisory Highlights Junk Fees Special Edition*, Cons. Fin. Protection Bureau 4 (Winter 2023), https://tinyurl.com/3ste5dfr. The CFPB explained that "[w]hile work is ongoing, at this early stage Supervision has already identified at least tens of millions of dollars of consumer injury and in response to these examination findings, institutions are providing redress to over 170,000 consumers" and indicated the CFPB intends to continue pursuing such "legal violations surrounding [authorized positive, settle negative] overdraft fees both generally and in the context of specific public enforcement actions[, which] will result in hundreds of millions of dollars of redress to consumers." *Id.*

55.    The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised

financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin: Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, Fed. Reserve Bd. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

56.    On April 26, 2023, the Office of the Comptroller of the Currency ("OCC") joined the chorus of regulators, issuing a bulletin to banks addressing the risks associated with overdraft protection programs. The OCC addressed the practices as follows:

> Some banks assess overdraft fees on debit card transactions that authorize when a customer's available balance is positive but that later post to the account when the available balance is negative.
>
> In this scenario, a customer's account has a sufficient available balance to cover a debit card transaction when the transaction is authorized but, due to one or more intervening transactions, has an insufficient available balance to cover the transaction at the time it settles. This is commonly referred to as an APSN transaction. In addition to assessing an overdraft fee on the APSN transaction, some banks also assess an overdraft fee on intervening transactions that exceed the customer's available balance. In this scenario, for example, the bank reduces a customer's available balance by an amount that is more than, equal to, or less than the initial authorized debit card transaction, and subsequently, an intervening transaction further reduces the customer's available balance so that the account no longer has a sufficient available balance. The bank charges an overdraft fee on both the intervening transaction and the initial APSN transaction when posted to the customer's account.
>
> The OCC has reviewed a number of overdraft protection programs that assess overdraft fees on APSN transactions. In some instances, the OCC has found account materials to be deceptive, for purposes of Section 5, with respect to the banks' overdraft fee practices. In these instances, misleading disclosures contributed to findings that the APSN practice was also unfair for purposes of Section 5. In addition, and based on subsequent analysis, even when disclosures described the circumstances under which consumers may incur overdraft fees, the OCC has found that overdraft fees charged for APSN transactions are unfair for purposes of Section 5 because consumers were still unlikely to be able to reasonably avoid injury and the facts met the other factors for establishing unfairness.

*OCC Bulletin 2023-12: Overdraft Protection Programs: Risk Management Practices*, OFFICE OF COMPTROLLER OF THE CURRENCY (Apr. 26, 2023), https://tinyurl.com/mt63pfnb (footnotes omitted).

### E. Defendant's Opt-In Form

i. *Defendant's Opt-In Form does not accurately explain how or when overdrafts are determined.*

57.     Defendant's Opt-In Form states:

An overdraft is when you do not have enough money in your account to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:
…

**What are the standard overdraft practices that come with my account?**

We do authorize and pay overdrafts for the following types of transactions:
- Checks and other transactions made using your checking account number
- Automatic bill payments.

**We do not authorize and pay overdrafts for the following types of transactions unless you ask us to by checking *YES* on the form below:**
- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transaction. If we do not authorize and pay an overdraft, your transaction may be declined.

**What fees will I be charged if *WEST*consin Credit Union pays my overdraft?**
Under our standard overdraft practices:
- We will charge you a fee up to $30 each time we pay an overdraft
- If your account is overdrawn for seven or more consecutive days, we will charge an additional $30
- There is no limit on the total fees we can charge you for overdrawing your account

**What if I want *WEST*consin Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions?**
If you want us to authorize and pay overdrafts on ATM and everyday debit card transaction, complete and submit this form. You may also opt in for this protection at one of our offices, call…

If there are multiple owners, only one signature is needed to add or remove the overdraft coverage.

15

| | | |
|---|---|---|
| **Add coverage** | ___ | Yes, I want *WEST*consin Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions. |
| **Remove coverage** | ___ | Yes, I want *WEST*consin Credit Union to authorize and pay overdrafts on my ATM and everyday debit card transactions. |

Ex. A (emphasis in original).

58.     In the description above and elsewhere in Defendant's Opt-In Form, Defendant fails to provide a clear and unambiguous description of both the how and when its members can expect to be assessed overdraft fees.

59.     Defendant's Opt-In Form does not accurately represent Defendant's actual fee practices because (1) it fails to explain how Defendant determines whether there is "enough money" in the account to pay a transaction; or (2) it does not explain whether overdrafts are determined at authorization or settlement.

60.     Defendant's failure to identify and explain its overdraft program prevents consumers from affirmatively consenting (or opting in) to the program. Rather, after reviewing the Opt-In Form, consumers are left with no understanding as to how or when Defendant determines overdrafts.

61.     Defendant's Opt-In Form thus flouts Regulation E's purpose of "protec[ing]… individual consumers engaging in electronic fund transfers, "12 C.F.R. § 1005.1(b), and requiring Defendant to "[p]rovide[] the consumer with a notice in writing,… segregated from all other information, describing the institution's overdraft service" and "[p]rovide[] a reasonable opportunity for the consumer to affirmatively consent, or opt it, to the service." 12 C.F.R. § 1005.17(b)(1)(i)-(ii).

62.    Defendant's Opt-In Form likewise flouts the EFTA's "primary objective," which is the "provision of individual consumer rights." 15 U.S.C. § 1693(b).

*ii.  Defendant's Opt-In Form omits information required by Regulation E and the EFTA*

63.    Regulation E provides that the required opt-in notice "must be substantially similar to Model Form A-9 set forth in appendix A of this part, include *all* applicable items in this paragraph, and may not contain any information not specified in or otherwise permitted by this paragraph." 12 C.F.R. § 1005.17(d) (emphasis added). Such requirements include, *inter alia*, "Limits on fees charged, the maximum number of overdraft fees or charges that may be assessed per day, or, if applicable, that there is no limit." 12 C.F.R. § 1005.17(d)(1)(3).

64.    In direct violation of this requirement, Defendant's Opt-In Form is not "substantially similar to Model Form A-9."

65.    Defendant's Opt-In Form does not comply with Regulation E or the EFTA's requirements to describe or provide notice of Defendant's overdraft practice. Therefore, pursuant to Regulation E and the EFTA, Defendant does not have the authority to assess an OD Fee against Plaintiff or other consumers' accounts as a result of any one-time debit card or ATM transaction. 12 C.F.R. § 1005.17(b); 15 U.S.C. § 1693(a).

**F.  Plaintiff's Experience**

66.    Defendant charged Plaintiff OD Fees on one-time debit card transactions on numerous occasions.

67.    For example, Plaintiff was assessed $30.00 OD Fees on two separate one-time debit card transactions on November 12, 2024.

68.    Because Defendant's Opt-in Form does not comply with Regulation E or the EFTA, Plaintiff was unable to predict these fees or affirmatively consent (or opt-in) to Defendant's

overdraft program. Hence no OD Fee should have been assessed against her account for these ATM and one-time debit card transactions.

### G.  None of These Fees Were Errors

69.    The improper fees charged by Defendant to Plaintiff's account were not errors by Defendant, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

70.    Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

71.    Moreover, any such reporting would have been futile because Defendant's own contract admits that Defendant made a decision to charge these fees.

## II.    THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

72.    Pursuant to Wisconsin law, a duty of good faith and fair dealing is imposed on every contract.

73.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are vested with a discretionary power over the other party. Further, as to bank transactions, the Uniform Commercial Code ("UCC")—which has been adopted by all states—mandates good faith and fair dealing. As such, when a party such as Defendant gives itself discretion to act, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with the parties' reasonable expectations and means that Defendant is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, Defendant has a duty to honor transaction requests in a way that is fair to Plaintiff and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties.

74.     Here—in the adhesion agreements Defendant imposed on Plaintiff and its other customers—Defendant provided itself with numerous discretionary powers affecting customers' bank accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abused that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged these fees.

75.     Defendant exercised its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assessed improper fees. Further, Defendant abused the power it had over customers and their bank accounts and acted contrary to their reasonable expectations under the Contract. This is a breach of Defendant's implied covenant to engage in fair dealing and act in good faith.

76.     It was bad faith and entirely outside Plaintiff's reasonable expectations for Defendant to use its discretion to assess fees in these circumstances.

## CLASS ALLEGATIONS

77.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of Rule 23.

78.     The proposed Class is defined as:

> All Defendant checking account holders who, during the applicable statute of limitations, were opted into overdraft protection for one-time debit card transactions and ATM transactions and were assessed overdraft fees on these transactions.

79.     Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

80.     Excluded from the Class are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a

timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

81.     The members of the Class are so numerous that joinder is impractical. The Class consists of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be readily ascertained only by resort to Defendant's records.

82.     The claims of the representative Plaintiff are typical of the claims of the Class in that the representative Plaintiff, like all members of the Class, was charged improper fees as set forth herein. The representative Plaintiff, like all members of the Class, has been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Class and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Class. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Class.

83.     The questions in this action are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the Class.

84.     Among the questions of law and fact common to the Class include:

a.   Whether Defendant's OD Disclosure and Opt-In Form complied with the Requirements of Regulation E and the EFTA;

b.   Whether OD Fees on non-recurring debit card transactions and ATM transactions were assessed on customers' accounts without obtaining customers' affirmative consent, in violation of Regulation E and the EFTA;

c.   Whether Defendant's fee assessment practices breached the covenant of good faith and fair dealing imposed on it;

d.   Whether Defendant was unjustly enriched as a result of these fee assessment practices;

e.   The proper method or methods by which to measure damages; and

f.   The declaratory and injunctive relief to which the Class is entitled.

85.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Class will continue to suffer losses and Defendant's misconduct will proceed without remedy.

86.    Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

87.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

88.    Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all Class members, is at risk of additional improper fees. Plaintiff and the Class members are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

### **CAUSE OF ACTION ONE**

**Violation of Electronic Fund Transfer Act, 15 U.S.C. § 1693 *et seq.*, and
Regulation E, 12 C.F.R. § 1005 *et seq.*
(*On Behalf of Plaintiff and the Class*)**

89.     Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

90.     By charging overdraft fees on one-time debit card and ATM transactions without a Regulation E compliant opt-in form,, Defendant violates Regulation E, 12 C.F.R. § 1005, *et seq.*, the "primary objective" of which is "the protection of individual consumers," 12 C.F.R. § 1005.1(b), and which "carries out the purposes of the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693, *et seq.*" 12 C.F.R. § 1005.1(b)).

91.     Specifically, the fees violate what is known as the "Opt-In Rule" of Regulation E. 12 C.F.R. § 1005.17. The Opt-In Rule states: "a financial institution . . . shall not assess a fee or charge . . . pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice] . . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. *Id.*

92.     To comply with the notice requirement, the notice "shall be clear and readily understandable," 12 C.F.R. § 1005.4(a)(1), and "segregated from all other information, describing the institution's overdraft service," 12 C.F.R. § 1005.17(b)(1)(i). To assist in preparing such notice, Regulation E identifies the specific information that must be included in the opt-in notice and notes that no other information may be included. 12 C.F.R. § 1005.17(d). Regulation E also provides an exemplar opt-in notice as Model Form A-9 and expressly requires that any opt-in notice utilized by Defendant "shall be substantially similar to Model Form A-9 set forth in appendix A of this part." *Id.*

93.     To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and

truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide a reasonable opportunity for the customer to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17. Furthermore, choosing not to "opt-in" cannot adversely affect any other feature of the account.

94.     The intent and purpose of this opt-in disclosure is to "assist customers in understanding how overdraft services provided by their institutions operate . . . by explaining the institution's overdraft service . . . in a clear and readily understandable way"—as stated in the Official Staff Commentary, 74 Fed. Reg. 59033, 59035, 59037, 5940, 5948. This commentary is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 179 F. Supp. 3d 320, 324 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z).

95.     Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a "clear and readily understandable" description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Specifically, Defendant's Opt-In Form fails to satisfy 12 C.F.R. § 1005.17 because, *inter alia*, it fails to state when or how Defendant determines overdrafts on Plaintiff's one-time debit card and ATM transactions.

96.     Because Defendant failed to use a Regulation E complaint opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions. Plaintiff and members of the Class have been harmed by Defendant's practice of assessing OD Fees on

one-time debit card and ATM transactions when, under Regulation E, Defendant did not have authority to do so.

97.     The "primary objective" of the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b).

98.     Section 904 of the EFTA states that the CFPB "shall prescribe rules to carry out the purposes of this subchapter." 15 U.S.C. § 1693b(a)(1). The CFPB has prescribed such rules in the form of Regulation E, 12 C.F.R. § 1005, *et seq.*

99.     The EFTA's grant of authority to the CFPB includes the authority to issue model clauses "to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." 15 U.S.C. § 1693b(b). The CFPB has issued such model clauses in the form of Model Form A-9.

100.     Section 905 of the EFTA requires that "the terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed . . . . in accordance with regulations of the Bureau." 15 U.S.C. § 1693c(a). Such "terms and disclosures" "shall be in readily understandable language" and include information regarding "any charge for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4).

101.     Accordingly, in failing to use a Regulation E-compliant opt-in form, Defendant violated Section 905 of the EFTA by failing to make disclosures "in accordance with regulations of the Bureau."

102.     Plaintiff and members of the Class have been harmed by Defendant's practice of assessing OD Fees on one-time debit card and ATM transactions when, under Regulation E and the EFTA, Defendant did not have authority to do so.

103.    As the result of Defendant's violation of Regulation E, 12 C.F.R. § 1005.17, *et seq.*, and the EFTA, 15 U.S.C. § 1693c, Plaintiff and members of the Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit, pursuant to 15 U.S.C. § 1693m.

**CAUSE OF ACTION TWO**
**Unjust Enrichment in the Alternative to the First Claim for Relief**
**(*On Behalf of Plaintiff and the Class*)**

104.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

105.    Plaintiff, individually and on behalf of the Class, asserts a common law claim for unjust enrichment. This claim is brought solely in the alternative to Plaintiff's claim for violation of the EFTA and Regulation E and applies only if the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

106.    Defendant has knowingly accepted and retained a benefit in the form of improper fees to the detriment of Plaintiff and the members of the Class, who reasonably expect to be compensated for their injury.

107.    Defendant has retained this benefit through its fee maximization scheme, and such retention violates fundamental principles of justice, equity, and good conscience.

108.    Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Class and should be required to make restitution to Plaintiff and the members of the Class.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff and members of the Class demand a jury trial on all claims so triable and judgment as follows:

a.    Certification for this matter to proceed as a class action;

b.      Designation of Plaintiff as the Class Representative and designation of the undersigned as Class Counsel;

c.      Declaratory and injunctive relief to the extent Defendant is in violation of Regulation E and the EFTA;

d.      Restitution of all improper fees paid to Defendant by Plaintiff and the Class because of the wrongs alleged herein in an amount to be determined at trial;

e.      Actual damages in amount according to proof;

f.      Pre- and post-judgment interest at the maximum rate permitted by applicable law;

g.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees as permitted by the EFTA;

h.      Enjoin Defendant from continuing to misrepresent its overdraft practices; and

i.      Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, demands trial by jury.

Dated: May 6, 2025

*Electronically signed by Nathan DeLadurantey*
Nathan DeLadurantey
**DELADURANTEY LAW OFFICE, LLC**
136 East Saint Paul Avenue
Waukesha, WI 53188
Telephone: (414) 377-0515
nathan@dela-law.com

Lynn A. Toops*
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: 317-625-6481
ltoops@cohenmalad.com

J. Gerard Stranch, IV*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200

26

Nashville, Tennessee 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gstranch@stranchlaw.com

Christopher D. Jennings*
**JENNINGS & EARLEY PLLC**
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
chris@jefirm.com

*Pro hac vice* applications forthcoming
*Attorneys for Plaintiff and the Putative Class*